STATE OF MINNESOTA

COUNTY OF HENNEPIN

Jamie Bunkholt,

      Plaintiff,

v.

John Doe 1, acting in his individual
capacity as a Minneapolis Police Officer;
John Does 2-6, acting in their individual
capacities as Minneapolis Police Officers;
John Does 7 and 8, acting in their
individual and official capacities as
supervisory Minneapolis Police Officers;
Medaria Arradondo, acting in his
individual and official capacities as the
Minneapolis Chief of Police; and the City
of Minneapolis,

      Defendants.

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Court File No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

PERSONALLY SERVED

CITY CLERK DEPARTMENT

2022 JAN 20 PM 12: 01

FILED
MINNEAPOLIS, MINN

For her Complaint, Plaintiff Jamie Bunkholt ("Bunkholt") states and alleges as

follows:

1.     This is an action for money damages arising out of the violation of

Bunkholt's constitutional rights by Defendants, who used, or authorized the use of

excessive and deadly force against Ms. Bunkholt in retaliation for the exercise of her

First Amendment right to peaceably assemble outside of the Minneapolis Police

Department's 3rd Precinct. Ms. Bunkholt also brings this lawsuit against the John Doe

Supervisors (supervisory Defendants), the City, and Defendant Minneapolis Police

Department Chief Medaria Arradondo in their roles as trainers, supervisors, and policy-makers.

2.     Ms. Bunkholt also brings this lawsuit against Defendant City of Minneapolis under the United States Supreme Court case *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as well as state law tort claims against all parties.

3.     Ms. Bunkholt brings this action to vindicate her well-settled civil rights pursuant to Minnesota state law, 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth amendments to the United States Constitution.  These claims arise under Minnesota law, as well as federal civil rights and constitutional law, and the events underlying this Complaint took place in Hennepin County, Minnesota. As a result, the Minnesota state courts, through their general jurisdiction governing civil suits in the State of Minnesota, have subject matter jurisdiction over the Plaintiff's claims. Venue is proper pursuant to Minn. Stat. § 542.09 because the cause of action in this matter arose in Hennepin County.

4.     At the time of the incident, Ms. Bunkholt was 33 years old, and a United States citizen.

5.     Upon information and belief, all Defendants were at all times material to this lawsuit, United States citizens residing in the State of Minnesota.

6.     Defendants John Does 1-6, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as officers of the Minneapolis Police Department. They are sued in their individual capacities.

Ex. 2

7. Defendants John Does 7 and 8, upon information and belief, were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting as supervisory officers of the Minneapolis Police Department. They are sued in their individual and official capacities.

8. Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein the Chief of the Minneapolis Police Department and a policymaker for the MPD. He is sued in his individual and official capacities.

9. Defendant City of Minneapolis was at all relevant times a duly incorporated municipal entity under the laws of Minnesota, and was at all times relevant to this lawsuit, the political and corporate body charged with training, control and supervision over all personnel of the Minneapolis Police Department.

10. On May 27, 2020, Ms. Bunkholt, a photographer and visual artist from Atlanta, Georgia, was in town to visit friends and family, and to photograph, observe and show solidarity with the peaceful citizens gathering in Minneapolis to protest the death of George Floyd at the hands of police officers days earlier.

## THE MURDER OF GEORGE FLOYD AND THE WORLD-WIDE UPRISING

11. On May 25, 2020, just two days before the law enforcement's assault on Ms. Bunkholt, Minneapolis police officer Derek Chauvin killed George Floyd, aided and abetted by three other Minneapolis police officers.

12. The killing was captured on cell phone video by a teenager who then posted the video on her Facebook page. The video quickly went viral to a stunned and horrified world.

Ex. 2

13.     The grotesque killing of George Floyd was but one outrage perpetrated by the Minneapolis police department against its citizens in the last fifty years.

14.     The killing of George Floyd, the fact that the entire incident was captured in excruciating detail on cell phone video, and Defendant Minneapolis Police Department's well-documented abuse of its population triggered protests across the country and around the world.

15.     The murder of George Floyd spurred a nationwide reckoning on policing and race relations, and set off worldwide protests.

16.     For days after the killing of George Floyd, protesters gathered at the Third Precinct, the home precinct for Derek Chauvin and the other officers involved in his death.

17.     During the day, protesters at the Third Precinct were overwhelmingly peaceful. The crowd included people of every stripe all demanding an overhaul of the criminal justice system in general, and the Minneapolis Police Department in particular. Parents, grandparents, and even small children made the pilgrimage to the Third Precinct to bear witness and to be involved in the spectacle.

18.     Regardless of the peaceful actions of protestors, MPD, predictably, responded with force, including excessive and unreasonable use of tear gas, 40mm impact projectiles, and other "less lethal" munitions.

19.     On May 26, 2020, Minneapolis Councilmember Andrew Johnson denounced the police use of chemicals and projectiles, stating: "What I saw from some

4

of the scenes last night looked to be disproportionate and escalating force…It's extremely concerning, and we need answers and accountability for that."

20.     Another Minneapolis Councilmember, Steve Fletcher, described on May 28, 2020, that the police had flipped the script on peaceful protesters: "The community gathered Tuesday night to mourn and express their outrage, peacefully. Tactical decisions byMPD shifted the dynamic of the crowd…to confrontation."

21.     Minneapolis Councilmember Jeremiah Ellison described the same phenomenon.  Councilmember Ellison said: "The police always respond this way to crowds, and things get out of hand…And I don't know how the strategy doesn't change. And I'll tell you right now I've made calls requesting that the strategy change and it still has not."

22.     On May 27, 2020, Minneapolis Mayor Jacob Frey told residents that he understood their anger and he encouraged peaceful protests: "What we need now in terms of protesting is peaceful protesting. . . No one out there will fight harder for their right (to protest). . . But those rights stop at a line when public safety is at risk and we need to be making sure that we're looking out for the safety of our residents."

23.     That was the same day Ms. Bunkholt became a victim of excessive force by MPD while committing no crimes and peacefully photographing the protests.

**BUNKHOLT IS INJURED BY DEFENDANTS**

24.     Around dusk, Ms. Bunkholt was outside the 3rd Precinct on Lake Street, milling around with other citizens. The scene was calm, non-violent, almost cathartic as civilians chanted, held up signs, and sang at the location that they viewed to be ground-

5

zero for Minneapolis police abuses. Like everyone else she could see, Ms. Bunkholt was committing no crime; merely exercising her right to peacefully assemble, observe law enforcement activities, and to protest abuses by police.

25.     The protests remained peaceful at this time. No order to disperse had been given by police, and Plaintiff had not been given any directives or orders by police. She was committing no crimes, possessed no weapons, and did not damage any property.

26.     Suddenly and without warning or provocation Defendant Minneapolis police officer John Doe 1 fired a rubber bullet, or 40mm impact projectile, from the roof of the 3rd Precinct, striking Ms. Bunkholt in the back of her head. It hardly needs to be pointed out that firing a rock-hard rubber bullet into the head of an innocent civilian constitutes unwarranted deadly force, and has no connection to any legitimate law enforcement objective. By firing the rubber bullet at Plaintiff in these circumstances, Defendant John Doe 1 caused her to be seized unreasonably.

27.     Badly hurt, Ms. Bunkholt was carried to a safe location by others to be stabilized. No Defendants or other MPD assisted her in any way.

28.     As a result of the acts and omissions of Defendants, Ms. Bunkholt has sustained numerous neurological injuries, a concussion, pain and suffering, medical bills, other injuries both permanent and temporary, as well as lasting emotional trauma.

29.     The next day, while Ms. Bunkholt lay out of commission, grievously injured by Defendants' unlawful and excessive use of force against a law-abiding citizen in response to peaceful protests, the City held a press conference, issuing the following statement: "The City encourages everyone to exercise caution and stay safe while

Ex. 2

participating in demonstrations, including wearing masks and physical distancing as much as possible to prevent the spread of COVID-19. The City has made hundreds of masks available to protesters this week."

30.     The irony of the contrast between the City's public-facing statements, and the reality of its response on the ground cannot be overstated. The City has a well-document, pervasive history of covering up unchecked excessive force and police misconduct.

31.     While MPD and the City told the news media and the world they supported peaceful protests, police commanders and supervisors were authorizing the indiscriminate and unreasonable use of weapons against civilians. As was exposed during a recent criminal trial involving police officers riding around during protests in an unmarked van "hunting" protestors and shooting them – without warning – with the same weapon used against Plaintiff, one police commander stated ""Instead of chasing people around ... you guys are out hunting people now, and it's just a nice change of tempo."

32.     Bunkholt took part in classic First Amendment-protected activity. To paraphrase Councilperson Ellison, the MPD did what it always does.  Bunkholt therefore became one of the many victims of the MPD's pattern and practice of excessive force without fear of repercussion.

33.     Ms. Bunkholt was shot before any curfew had been announced. She was not committing any crimes, displayed no aggression, and was unarmed. No warnings were given by Defendants, there was no looting or rioting occurring, and the scene was not chaotic or dangerous.

Ex. 2

34. There can be no mistake that the attack on Ms. Bunkholt was intentional. The design of the weapon makes accidental firing impossible. Defendant Doe 1 therefore, volitionally held the launcher in firing position, requiring him to hold the foregrip of the launcher and placing his firing hand on the pistolgrip of the launcher.

35. Defendant Doe 1 volitionally moved the safety lever on the launcher from the "safe" position to the "fire" position.

36. When the safety lever of the launcher is in the "safe" position, a finger cannot be placed on the trigger, and the weapon cannot be fired.

37. It is only when the safety lever is in the "fire" position that a finger can be placed on the trigger, making the launcher ready to fire.

38. Defendant John Doe 1 volitionally inserted his finger into the trigger guard, aimed it at his intended target – Plaintiff – and fired by squeezing the trigger. All of these were intentional actions on the part of John Doe Defendant 1. The use of force caused serious injury to Plaintiff.

39. Despite being contrary to MPD policy, John Does 1's actions were under the supervision and direction, and with the approval of, the supervisory Defendants, the Chief, and the City. No employee of the City rendered any aid to Ms. Bunkholt.

## THE UNREASONABLE USE OF DEADLY FORCE

40. MPD Policy 5-317 addresses the 40mm launcher that Defendant John Doe 1 used to shoot Ms. Bunkholt in the head.

41. Under Policy 5-317(I), the "MPD recognizes that combative, non-compliant, armed and or otherwise violent subjects cause handling and control problems

Ex. 2

that requires special training and equipment. The MPD has adopted the less-lethal force philosophy to assist with the de-escalation of these potentially violent confrontations." *See also,* Policy 5-317(V)(C), noting the launcher "can be used when the incapacitation of a violent or potentially violent subject is desired."

42.     Policy 5-317(II) defines a 40mm less-lethal round as a "[d]irect fire round used in situations where maximum deliverable energy is desired for the incapacitation of an aggressive, non-complaint subject."

43.     Under Policy 5-317(III)(D), MPD officers are forbidden from deploying the 40mm launchers for crowd-management purposes.

44.     Policy 5-317(III)(B)(1) notes that "[t]he use of the 40mm less-lethal round should be considered a level slightly higher than the use of an impact weapon and less than deadly force when deployed to areas of the subject's body that are considered unlikely to cause death or serious physical injury."

45.     The policy further directs officers – when authorized to use the launcher – to aim for the lower extremities, and avoid the head, neck, spine, groin, and kidneys. Ms. Bunkholt was shot in the head.

46.     Policy 5-317(IV)(B)(2) states that "[o]fficers shall be aware that delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury that can lead to permanent physical or mental incapacity or possible death."

47.     Policy 5-317(IV)(B)(2) states that the "[a]reas susceptible to death or possible severe injury are the head, neck, throat, and chest" and that these areas should be avoided "[u]nless deadly force is justified." The policy further requires officers to render

9

aid, photograph the subject and injuries, and report the force both in writing, and via dispatch to a supervisor. Supervisors are notified because they are required to respond to the scene anytime a 40mm round is used. A supervisor must review the incident and complete a use-of-force review. Further, the responding supervisor(s) are to ensure that the spent rounds are collected and property inventoried, if possible. *See* Policy 5-317(V)(G)(3)-(4).

48.     Defendant John Doe 1's use of deadly force against Ms. Bunkholt contravened MPD's explicit, written policy, and clearly established constitutional rights of Plaintiff, but comported with the actual orders and direction given by the Supervisor Defendants, the Chief, and the City during the protests.

49.     Upon information and belief, no aspect of the explicit policy above was followed by any of the Defendants with regards to the projectile fired into Ms. Bunkholt's head. No warning was given. She was not a threat. No force was authorized, and certainly not deadly force. She was shot in the head, but no aid was rendered nor documentation made. Upon information and belief, John Doe 1 was never disciplined by the City or the Chief for the unauthorized use of force against Plaintiff, and no use of force review was made by any supervisor.

50.     The City has long allowed its officers to violate the constitutional rights of citizens and visitors without fear of consequence. The instances are too numerous to completely recount here, and are well documented in this federal District.

51.     Numerous innocent civilians suffered injuries in similar circumstances to Plaintiff in late-May and early June of 2020 at the hands of the City and its officers and

agents. Ethan Marks, Jaleel Stallings, and Soren Stevenson were all shot and injured with "less lethal" projectiles during the protests, among many others.

52.     As was revealed by body worn camera footage in the trial where Stallings was acquitted, and subsequently reported on by several news outlets, police officers in Minneapolis in the relevant time period were riding around in vans shooting innocent civilians with 40 mm weapons while saying "Be vewy vewy quiet. We're hunting activists."[1]

53.     Additionally, upon information and belief, Defendants Does 1-6 either failed to follow MPD policies with regard to report writing and supervisor notification *or* falsified reports, utilizing systematic buzz words and phrases in an attempt to conceal the unauthorized use of deadly force on Bunkholt.

54.     John Doe 1 was required by MPD Policy 5-306 to document the use of force and notify a supervisor, as well as to remain on scene and render aid/document injuries. The use of force report was required to be made by the end of the shift. None of this occurred. The policy also required use of force supplements to be completed.

55.     Policy 4-602(A) mandated that "[a] short public narrative statement describing the offense or incident" shall be prepared. Yet even this simple synopsis of events was not completed with regard to the shooting of Bunkholt, or the others mentioned.

---

[1] "Minneapolis Police Caught on Video Hunting Activists" https://www.rollingstone.com/politics/politics-features/minneapolis-police-video-hunting-activists-jaleel-stallings-1241227/

Ex. 2

56. If the applicable MPD policies outlined above had been followed, the following information would be readily available:

     i. A description of the scene and events leading up Defendant Doe 1 pulling thetrigger

     ii. The identity of shooter

     iii. The identities of witness officers

     iv. The identities of lay witnesses at the scene

     v. The treatment and aid rendered by MPD officers (if any)

     vi. A description of the injuries Bunkholt suffered

     vii. Identification of the launcher used and projectile deployed by the shooter

57. Instead, rank-and-file MPD officers have felt free to flagrantly violate subjects' constitutional rights under department-wide reporting methods to cover up their misconduct.

58. Despite policies stating otherwise (*see* MPD Policy 5-105 – requiring officers to "immediately report any violation of rules, regulations or laws that come to their attention, including force-related misconduct"), candor with regard to fellow officers' obvious constitutional violations is nonexistent at the MPD.

59. Instead, rank-and-file MPD officers (and beyond) have helped said unconstitutional actors to hide behind a code of silence and non-cooperation.

60. MPD officers have been instructed by their Union (the Minneapolis Police Federation) not to aid in investigations into other officers, and they follow said

Ex. 2

instruction.[2]

61.     The supervisory Defendants and policymakers at the City of Minneapolis and the Minneapolis Police Department had actual knowledge of the constitutionally infirm reporting and lack of adherence to MPD policies among officers or were deliberately indifferent to the need for proper reporting by turning a blind eye.

62.     Not only are MPD officers routinely not disciplined when they fail to truthfully report the unauthorized use of deadly force or fail to cooperate with investigationsinto fellow officers, the Minneapolis Police Federation is actively encouraging them to do so.

63.     Other than lip service, there has been no response by the City and Chief Arradondo to curb this practice of behavior by MPD officers and the Minneapolis Police Federation.

64.     Consequently, Federation members know that they can act in the above-described ways with complete impunity.

65.     The actions of the uncooperative and policy-violating MPD officers, and the failures of the City and Chief Arradondo to discipline the officers for such conduct, fly in the face of MPD's Code of Conduct, embolden officers to act without regard for the rights of citizens, and were a moving force behind the deprivation of Bunkholt's federal civil rights.

---

[2] https://www.startribune.com/noor-trial-unfolding-amid-debate-over-blue-wall-of-silence/508574012/

Ex. 2

66.     Some combination of the failure to report, the failure to report truthfully, and the failure to cooperate in investigations has occurred here.

67.     Defendants Does 2-6 actively encouraged Defendant Doe 1's use of excessive force by colluding with Defendant Doe 1 and one another to eschew report writing and supervisor notification, or to fail to report truthfully.

68.     Defendants Does 1-6 used the absence of report writing and supervisor notification or the absence of truthful report writing to frustrate Bunkholt's assertion of her civil rights.

69.     Defendants Does 7-8, the City and Chief Arradondo have acquiesced in said collusion by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

70.     Defendants Does 7-8, the City and Chief Arradondo have acquiesced in further frustration of Bunkholt's civil rights by failing to require adherence to policies regardingreport writing, supervisor notification and policy-violation notifications.

71.     Defendants Does 7-8, the City and Chief Arradondo have acquiesced in numerous additional policy violations by Defendants Does 1-6 going unpunished with regard to the events surrounding the shooting of Bunkholt.

72.     The supervisory Defendants were causally and directly involved in the violation of Bunkholt's constitutional rights.

73.     As a result of the department-wide reporting and cover-up methods, Bunkholt has been unable to identify the shooter – Defendant Doe 1 – by name.

74.     Further, it is clear from the news video that multiple officers in the area of

Ex. 2

Bunkholt's shooting were equipped with body-worn cameras (BWCs).

75.     MPD policies required that the officers at the scene have their BWCs in recording mode because the following applied to the subject incident: in-person contact by officers, use of force by officers, use of deadly force by officer and the situation amounted to a critical incident as defined by MPD policy. *See* Policy 4-223.

76.     In the event that the BWCs were not in recording mode prior to the shooting of Bunkholt, they were required to be "activated as soon as it [was] safe to do so" under Policy 4-223(5)(6)(a)(vii).

77.     The digital audio-video evidence that the BWCs were to have collected from the scene was to be uploaded at the conclusion of the officers' shifts with the proper classification that linked it to the proper incident under Policy 4-223(8)(a)-(d).

78.     Fail-safes in the MPD BWC policy also would ensure that some information regarding the event was reported in the event that the officers at the scene of Defendant Doe 1's shooting of Bunkholt had failed to put their BWCs in recording mode. *See* Policy 4-223(6)(d).

79.     However, rank-and-file MPD officers have felt free to violate MPD's policies with regard to BWC usage, which dovetails with the department-wide cover-up methods described above.

80.     The supervisory Defendants and policymakers at the MPD and the City of Minneapolis had actual knowledge of policy violations among officers with regard to the BWCs or were deliberately indifferent to the need for proper use or reporting of the failure to activate the BWCs by turning a blind eye.

81.     The lack of consequences imposed upon MPD officers who protect their own or who, in violation of their sworn duties as peace officers, fail to cooperate with investigations into such matters ensures that the Blue Wall of Silence remains intact. Chief Arradondo has repeatedly failed to hold such officers accountable.

82.     Numerous MPD officers and the City continue to hamper Bunkholt's ability to investigate and vindicate her civil rights.

83.     MPD Policy 5-101.01 provides that:

> The integrity of police service is based on truthfulness. Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her official duty as a Minneapolis Police Officer.
>
> MPD employees shall not willfully or knowingly make an untruthful statementor knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic charge or seek to unlawfully influence the outcome of any investigation.
>
> These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employmentor position regardless of whether such information is requested during a formalinvestigation or during the daily course of business.
>
> MPD employees are obligated under this policy to respond fully and truthfully toquestions about any action taken that relates to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business

84.     The MPD's continued failure to discipline officers, through policymakers Defendants Does 7-8 and Chief Arradondo, causes MPD officers to act with impunity and without due regard for the Constitution and laws of the United

Ex. 2

States. The consequences of this are becoming all the more apparent and pervasive.

85.     Ms. Bunkholt continues to suffer the consequences of the Defendants'

actions to this day.

### Count I
### 42 U.S.C. § 1983 –Fourth and Fourteenth Amendment Violations
*Plaintiff v. Defendant John Doe 1, in their individual capacity*

86.     Ms. Bunkholt realleges each of the preceding allegations as if set forth fully

herein.

87.     The above described acts – under color of state law – constitute excessive

and deadly use of force, an unlawful seizure, and all in violation of the Fourth

Amendment, as incorporated through the Fourteenth Amendment.

88.     Defendants' conduct violated Ms. Bunkholt's clearly-established and well-

settled civil rights to be free from unreasonable seizure, and excessive force.

89.     Defendants' acts and omissions directly and proximately caused Ms.

Bunkholt's injuries and damages. Ms. Bunkholt is therefore entitled to a compensatory

damages award in excess of $100,000.00.

90.     Defendants subjected Ms. Bunkholt to these deprivations in such a manner

as to render Defendants liable for punitive damages, which are hereby alleged as a matter

of federal common law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983), in an amount

exceeding $500,000.00.

91.     Ms. Bunkholt entitled to recovery of prejudgment interest as well as her

costs against Defendants, including reasonable attorneys' fees under 42 U.S.C. § 1988.

Ex. 2

## Count II
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
*Plaintiff v. Defendant John Does 1-6, in their individual capacities*

92.     Ms. Bunkholt realleges each of the preceding allegations as if set forth fully herein.

93.     On the evening of May 27, 2020, Ms. Bunkholt was engaged in her constitutionally protected right to monitor police activity, to free speech, to protest law enforcement abuses, and to peacefully assemble.

94.     Defendants John Does 1-6, acting under color of law, retaliated against Ms. Bunkholt for engaging in her constitutionally protected activity by shooting her with a rubber bullet in the head. Such conduct constitutes unreasonable and deadly force.

95.     The illegal deadly force used on Ms. Bunkholt was covered up by John Does 1-6 who hid behind their anonymity and concealed their deployment of unreasonable and deadly force.

96.     The deadly force deployed against Ms. Bunkholt was specifically intended to deter the exercise of and chill her First Amendment right to observe police activity and to peacefully protest police abuses. Defendants subjected her to these deprivations either maliciously or by acting with reckless disregard for whether her rights would be violated.

97.     As a direct and proximate cause of the Defendants' unconstitutional conduct, Ms. Bunkholt is entitled to damages exceeding $100,000.00.

98.     Punitive damages in an amount exceeding $500,000.00 are available against Defendants and are claimed as a matter of federal common law under *Smith v.*

18

Ex. 2

*Wade*, 461 U.S. 30 (1983), and are not subject to the pleading requirements under Minnesota law.

### Count III
**Supervisory Liability**
*Plaintiff v. John Does 7-8 and Medaria Arradondo, in their individual capacities*

99.   Ms. Bunkholt realleges each of the preceding allegations as if set forth fully herein.

100.   Defendants John Does 7-8 and Medaria Arradondo at all times material heretowere members of the Minneapolis Police Department with supervisory responsibilities over Defendants John Does 1-6.

101.   These supervisory Defendants at the City of Minneapolis had actual knowledge of the constitutionally infirm force reporting in widespread use among officers.

102.   As such, rank and file, such as Defendants John Does 1-6 with regard to Bunkholt, freely and fragrantly violate citizens' constitutional rights using department-widereporting methods to cover it up.

103.   The supervisory Defendants had actual knowledge of the improper reportingby Defendants John Does 1-6 regarding the Bunkholt incident and other similar incidents, further evidencing a policy or custom of constitutional misconduct.

104.   These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violation of Bunkholt's constitutional rights by Defendants John Does 1-6.

Ex. 2

105.    As a direct and proximate result of the acts and omissions of Defendants John Does 7-8 and Medaria Arradondo, Bunkholt suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $500,000.

106.    Punitive damages in an amount exceeding $500,000 are available against Defendants John Does 7-8 and Medaria Arradondo and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

107.    Bunkholt is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count IV
### *Monell* Liability
*Plaintiff v. John Does 7-8, City of Minneapolis, and Medaria Arradondo, in their official capacities*

108.    Ms. Bunkholt realleges each of the preceding allegations as if set forth fully herein.

109.    Before May 27, 2020, the City of Minneapolis, with deliberate indifference tothe rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of force, including deadly force.

110.    Through policymakers Defendants John Does 7-8 and Chief Arradondo, and with the department's ratification and approval, by failing to discipline all officers

Ex. 2

consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including deadly force.

111.   Bunkholt's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices and the City of Minneapolis is thereby liable in an amount exceeding $500,000.

112.   Bunkholt is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count V
### Minnesota Common Law Battery
*Plaintiff v. All Defendants*

113.   Ms. Bunkholt realleges each of the preceding allegations as if set forth fully herein.

114.   Defendants committed the tort of battery by using force against Plaintiff's person, without her consent, and causing her injuries.

115.   Defendants' battery of Plaintiff was the direct and proximate cause of Plaintiff's injuries and money damages.

116.   The Minneapolis Police Department is jointly and severally liable for the actions of Defendant Officers' under the doctrines of agency and *respondeat superior*.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jamie Bunkholt prays for judgment against Defendants as follows:

1.   For a money judgment for damages on all Counts against all Defendants

Ex. 2

jointly and severally, in excess of $500,000.00, the exact amount to be determined by a jury;

2.      For punitive damages on Counts I, II and III, in excess of $500,000.00, in an amount to be determined by a jury;

3.      Prejudgment interest, disbursements, and costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable law; and

4.      For such other and further relief as this Court deems just and equitable.

## ACKNOWLEDGEMENT

Plaintiff, through its undersigned attorneys, hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, to the party against whom the allegations in this pleading are asserted.

Respectfully submitted,

**APPLEBAUM LAW FIRM**

/s/ Paul Applebaum

Date: Jan. 17, 2022

Paul Applebaum, #223098
First National Bank Bldg.
332 Minnesota St., Ste. W1610
St. Paul, MN 55101
Phone: 651.222.2999
*paul@applebaumlawfirm.com*

-and-

22

Ex. 2

**ANDREW IRLBECK LAWYER CHTD.**

Dated: Jan. 17, 2022

/s/ Andrew M. Irlbeck
Andrew M. Irlbeck, #392626
First National Bank Bldg.
332 Minnesota St., Ste. W1610
St. Paul, MN 55101
Phone: 612-986-3895
Fax: 651-223-5179
*andrew@irlbecklaw.com*
ATTORNEYS FOR MS. BUNKHOLT

Ex. 2